## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MAINE MEDICAL CENTER, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Docket No. 2:21-cv-00179-NT |
| GENERAL REINSURANCE CORPORATION, | ) ) ) ) |
| Defendant. | ) ) |

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before me are a motion for summary judgment by Defendant General Reinsurance Corporation ("**GRC**") (ECF No. 29) and a motion for summary judgment by Plaintiff Maine Medical Center ("**MMC**") (ECF No. 30). For the reasons set forth below, the Plaintiff's motion is **DENIED** and the Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

### FACTUAL BACKGROUND[1]

**I.   The Policies**

This case concerns a dispute over two successive insurance policies (the "**Policies**") issued by the Defendant, GRC, to the Plaintiff, MMC. The first policy was effective from April 16, 1995, to January 1, 2001, and the second from January 1, 2001, to January 1, 2003. Joint Statement of Material Facts in Supp. of Parties' Mots.

---

[1] These facts are drawn from the parties' Joint Statement of Material Facts ("**JSMF**") (ECF No. 28). In addition, I consider documents that are part of the record on these cross-motions for summary judgment, including the Excess Insurance Policies (ECF Nos. 8-1 & 8-2) and the 2006 Workers' Compensation Board Order (ECF No. 8-3).

for Summ. J. on Phase I Issues ("**JSMF**") ¶¶ 1–4 (ECF No. 28). The Policies have an "Insured's Retention" of $500,000. JSMF ¶ 5. Under the policies, GRC is required to indemnify MMC for certain employee injury claims in excess of the Insured's Retention of $500,000. JSMF ¶ 6. The Policies state in relevant part:

> This insurance applies to losses paid by the Insured as a qualified self-insurer under the Workers Compensation Law for bodily injury by accident or bodily injury by disease including resulting death, provided:
>
> 1. the bodily injury by accident occurs during the period this policy is in force; or
>
> 2. the bodily injury by disease is caused or aggravated by the conditions of employment by the Insured. The employee's last day of last exposure to those conditions of that employment causing or aggravating such bodily injury by disease must occur during the period this policy is in force.

JSMF ¶ 6; Answer to Compl. & Countercl. Ex. A ("**1995–2001 Policy**"), at 2 (ECF No. 8-1); Answer to Compl. & Countercl. Ex. B ("**2001–2003 Policy**"), at 2 (ECF No. 8-2).

> The Policies define "Accident" as follows:
>
> 1. Accident means each accident or occurrence or series of accidents or occurrences arising out of any one event.
>
> 2. An accident is deemed to end 72 hours after the event commences. Each subsequent 72 hours is deemed to be a separate accident period.

JSMF ¶ 6; 1995–2001 Policy, at 5; 2001–2003 Policy, at 5.

**II.    J.L. and Her Injuries**

J.L. worked at MMC as a respiratory therapist from 1973 to 1988 and then as a perfusionist from 1990 to March 8, 2004, her last day of employment with MMC. JSMF ¶ 12.  In her role as a perfusionist, J.L. operated a heart-lung machine during cardiac surgery. JSMF ¶ 13. As a perfusionist, J.L. worked under "conditions of

2

extraordinary pressure," and her position "require[d] a fair amount of hand and arm work, in both the set up and operation of the machinery which involve[d] attaching a number of tubes and placing and removing a number of clamps, as well as pushing the machine to and from the operating room." Answer to Compl. & Contercl. Ex. C ("**May 2006 WCB Order**"), at 4 (ECF No. 8-3).

In 2004, J.L. filed six claims before the Workers' Compensation Board ("**WCB**") under the Maine Workers' Compensation Act ("**MWCA**") alleging injuries suffered on six dates during her employment and seeking "total incapacity benefits from March 8, 2004." JSMF ¶ 14; May 2006 WCB Order, at 2. The first injury, alleged to have occurred on January 1, 1996, claimed repetitive motion injuries to J.L.'s arms, right elbow, and shoulder "from working the connections and line clamps." May 2006 WCB Order, at 4. The Hearing Officer found that this first injury was time-barred. May 2006 WCB Order, at 5. The second injury, alleged to have occurred on September 27, 1996, claimed an injury to J.L.'s back, neck, arms, and lower back, sustained while moving machinery. May 2006 WCB Order, at 5. The Hearing Officer also considered the second injury time-barred and noted that there was insufficient evidence establishing "the existence of a separate work-related injury to J.L.'s back, neck, and arms on September 27, 1996." May 2006 WCB Order, at 6.

The Hearing Officer granted J.L.'s third claim, for an "injury to both arms" alleged to have occurred on October 1, 1997, and her fourth claim, for an "injury occurring to her upper back[,] neck, and left arm" alleged to have occurred on

3

December 7, 2000. JSMF ¶ 16. As to the October 1, 1997, injury, the Hearing Officer wrote:

> This claim is for a gradual injury to [J.L.'s] back, neck, arms and shoulders and related body parts. The employer argues that the medical records do not support a claim for a new gradual injury as of this date. But the earlier treatment records reflect problems with [J.L.'s] right arm that had resolved by May of 1996 while the October 21[,] 1997 Practitioner's Report . . . indicates a diagnosis of bilateral tendonitis and the October 27[,] 1997 Provider Report . . . diagnoses bilateral epicondylitis as well as right upper trapezius spasm. Dr. Upham indicated that the problem was work-related. On November 6, 1997[,] the physical therapist . . . noted that [J.L.] reported . . . that she had problems in the past [with] good results from P T treatment[ ] and that she had done well  []until past month [with increased] work hours as well as an apparent nonwork-related incident involving carrying a garment bag. These appear to be new complaints of new injury arising out of and in the course of [J.L.'s] work activities as a perfusionist. There is no record of any treatment to her neck or back at this time. The injury was to her arms. I find and conclude that the employee has met her burden to establish that she suffered an injury to both arms on October 1, 1997 arising out of and in the course of her employment.

May 2006 WCB Order, at 6–7.

In regard to J.L.'s December 7, 2000, injury, the Hearing Officer wrote:

> [J.L.] also claims a gradual injury to her back[,] neck, arms and shoulders on December 7, 2000. On that date, she saw Gwendolyn O'Gunn . . . , her primary care physician for left upper back, shoulder and neck pain, with no history of recent injury. Dr. O'Gunn noted that [J.L.] worked in surgery and that she had been seen previously for similar problems through workers compensation. On March 5, 2001[,] Richard Maguire . . . saw her for what he diagnosed as a work-related left upper trapezius strain noting that it was aggravated by her work activities and that it "does appear to be different, at least from the records [from] her right upper trapezius muscle, which was a problem previously." On March 14[,] 2001[,] Ms. Lindeman told the [physical] therapist . . . that this problem was at times making it painful for it at work although she was not then missing work as a result. She also reported that the pain worsened by reaching for the computer at work and by stress and that she was working on a job site modification. On April 2, 2001[,] Dr. Maguire characterized her problem as myofascial

4

>pain in the left trapezius. I find and conclude that [J.L.] has met her burden to establish that she suffered an injury to her upper back[,] neck and left arm on December 7, 2000[,] arising out of and in the course of her employment.

May 2006 WCB Order, at 7–8.

J.L. also alleged a fifth injury to her left knee as well as her back, neck, arms, and shoulders occurring on May 1, 2003. May 2006 WCB Order, at 8. The Hearing Officer found that J.L. did not establish that the injuries to her knee and back were work related, and she did not "show any treatment for any additional or different arm or shoulder problem around this time." May 2006 WCB Order, at 8. The sixth claim involved a mental injury due to stress and a gradual physical injury culminating on March 8, 2004. May 2006 WCB Order, at 9. The Hearing Officer concluded that J.L. had not met her burden of establishing new injuries as of those dates. May 2006 WCB Order, at 11.

Ultimately, the Hearing Officer found J.L. "totally incapacitated at this time as a result of the work injuries suffered in 1997 and 2000 and their physical and psychological sequelae." May 2006 WCB Order, at 12. MMC filed petitions for review, and the WCB upheld the May 2006 WCB Order "awarding [J.L.] total incapacity benefits based on work injuries of October 1, 1997 and December 7, 2000." JSMF ¶ 18 (citation omitted). MMC appealed the May 2013 WCB Order, which was upheld by the WCB Appellate Division in 2014. JSMF ¶¶ 19, 20.

MMC alleges that, through May 2021, it has paid wage benefit payments of $571,993.65 and medical payments of $18,528.61 to J.L. JSMF ¶ 24. MMC seeks

5

excess loss indemnification for all amounts paid in excess of a single $500,000 retention for J.L.'s injuries. JSMF ¶ 25.

## III. Cross-Motions for Summary Judgment

Now, MMC and GRC each move for partial summary judgment on what they term "Phase I" issues.[2] MMC asks me to find that MMC's claim for indemnification for J.L.'s injuries is subject to a single $500,000 retention under the Policies. Pl. Maine Medical Center's Mot. for S.J. ("**MMC's MSJ**") 1 (ECF No. 30). GRC asks me to find that (1) MMC's claim for excess loss indemnification concerns multiple injuries suffered by J.L., (2) a separate $500,000 retention applies to each separate injury within the Policies' lifespans, and (3) even if J.L's injuries are a single cumulative injury, the cumulative injury implicates the Policies only if J.L.'s last day of exposure to the conditions of her employment that caused or aggravated that injury occurred during one of the policy periods. General Reinsurance Corporation's Mot. for Partial S.J. on Phase I Issues ("**GRC's MSJ**") 1 (ECF No. 29).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party moving for summary judgment bears the initial burden of showing that no" such genuine dispute exists. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970

---

[2] The parties have agreed that certain issues need not be addressed until Phase 2 of the litigation. Potential Phase 2 issues include: (1) if multiple retentions apply, the apportionment of costs between each of Lindeman's injuries, and (2) when Lindeman's last day of last exposure to the conditions that caused or aggravated her injuries occurred, and whether that was outside the policy period. General Reinsurance Corp's Pre-Filing Conference Mem. for Phase I Issues 4–5 (ECF No. 21).

6

F.3d 53, 62 (1st Cir. 2020). Once it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in his favor" with respect to each issue on which he bears the burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). Judgment should be entered "if . . . there can be but one reasonable conclusion" come trial, but "[i]f reasonable minds could differ," judgment should not be entered for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51 (1986). Whether a contract clause is ambiguous, as well as the interpretation of an unambiguous contact, is a question of law that may be decided on a motion for summary judgment. *See Fowler v. Boise Cascade Corp.*, 739 F. Supp. 671, 673 & n.2 (D. Me. 1990), *aff'd*, 984 F.2d 49 (1st Cir. 1991).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (citation omitted). I must "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party," *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (citation omitted), and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed," *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021), *cert. denied sub nom. Merchant v. Mayorkas*, 141 S. Ct. 2858 (2021) (citation omitted).

## DISCUSSION

### I. Interpreting the Policies

While the parties disagree about the interpretation of the Policies and the WCB Order, they agree that the issues before me are questions of law that can be

7

decided on the stipulated record. GRC's MSJ 8; MMC's Opp'n to GRC's MSJ 1 (ECF No. 31). Certain cannons of construction guide my analysis. Whether a term in a contract is ambiguous is a question of law. *Jipson v. Liberty Mut. Fire Ins. Co.,* 2008 ME 57, ¶ 10, 942 A.2d 1213. Unambiguous terms in insurance contracts are to be given their plain meaning, *see Johnson v. John Hancock Mut. Life Ins. Co.,* 507 A.2d 559, 560 (Me. 1986), but ambiguous terms are interpreted in favor of the insured, *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 19 (Me. 1990). The insured has the burden of proving the existence of coverage and the amount of the loss. *See Pelkey v. Gen. Elec. Cap. Assurance Co.,* 2002 ME 142, ¶ 10, 804 A.2d 385. The insurer bears the burden of proving the applicability of any exclusion. *Patrons Oxford Ins. Co. v. Harris,* 2006 ME 72, ¶ 19 n.6, 905 A.2d 819.

### A.  Clearing Up Misconceptions about the Policies

I begin by clearing up some of the confusion generated by both parties' imprecise presentation of the language of the Policies. The Plaintiff claims that the Policies "unambiguously provide[ ] that GRC will indemnify MMC for any 'loss' under the [Workers' Compensation] Law in excess of the insured's retention." MMC's MSJ 17–18. This is a misleading and incomplete construction of the text. What the Policies actually state is that GRC will indemnify MMC for "loss . . . under the Workers Compensation Law in excess of the Insured's retention stated in Item 6 on the Information Page." 1995–2001 Policy, at 2; 2001–2003 Policy, at 2. Item 6 on the Information Page explains that the Insured's Retention is for "each accident or each employee for disease." 1995–2001 Policy, at Information Page; 2001–2003 Policy, at Information Page. In other words, the Policies unambiguously provide that GRC will

8

indemnify an insured, not for *any* losses paid, but rather for losses related to *each accident* or *each employee for disease* in excess of the $500,000 retention. The Policies go on to elaborate that "Accident means each accident or occurrence . . . arising out of any one event." 1995–2001 Policy, at 5; 2001–2003 Policy, at 5. Further, "[a]n accident is deemed to end 72 hours after the event commences. Each subsequent 72 hours is deemed to be a separate accident period." 1995–2001 Policy, at 5; 2001–2003 Policy, at 5.

For its part, the Defendant repeatedly states that the Policies have "an unambiguous requirement of a per-injury retention." GRC's MSJ 3, 10, 17. That, too, is incorrect. The Policies apply the $500,000 retention either per accident or per employee for disease, and they clearly do not apply on a per injury basis. *See* 1995–2001 Policy, at Information Page; 2001–2003 Policy, at Information Page.

With those clarifications, I tackle the parties' arguments as to how to interpret the Policies.

### B.   Resolving How the Policies Treat "Gradual Injuries"

The Plaintiff takes the position that the payments to J.L. "are for a single, uninterrupted period of time as a result of a gradual injury." MMC's MSJ 19. The Plaintiff contends that gradual injuries fall within the category "injuries by accident" despite the Policies' 72-hour temporal limit on accidents that makes such a construction impossible on the facts before me. To get around the inconvenient and

9

unambiguous contractual language which confines accidents to a 72-hour period,[3] the Plaintiff points to a provision in each policy that states: "If terms of this policy are in conflict with any law applicable to this policy, this statement amends this policy to conform to such law." 1995–2001 Policy, at 11; 2001–2003 Policy, at 11.

From there, the Plaintiff refers back to the legislative history and judicial construction of the MWCA with the goal of convincing me that the Policies' use of the term "injury by accident" and the 72-hour temporal limit on accidents is inconsistent with MWCA's inclusion of gradual injuries. *See* MMC's MSJ 3–6. The long and short of this argument is that in 1975, the MWCA was amended to make clear that gradual injuries were covered. To do that, the legislature eliminated the "by accident" modifier from the phrase "injuries by accident." MMC's MSJ 4–6. Essentially, the Plaintiff argues that because Maine amended its workers' compensation law to include gradual injuries in the category that was once called "injuries by accident," I must interpret the Policies' "injuries by accident" language as covering gradual injuries. And to do that, I essentially have to read out of the contract the 72-hour temporal limitation on accidents.

There are two problems with this argument. First, the MWCA amendment occurred long before these Policies came into being. *See* MMC's MSJ 4. The fact that the Policies continued to use the "injuries by accident" language and the 72-hour temporal limit, if anything, should be interpreted as demonstrating an intent not to

---

[3] The Plaintiff argues that the terms "accident," "occurrence," and "event" are ambiguous. Pl. Maine Medical Center's Mot. for Summ. J. 18 & n.5 (ECF No. 30). Those terms may be ambiguous, but the language of the Policies that imposes a 72-hour limit on an accident or occurrence is not.

10

include gradual injuries in the "injuries by accident" category. Presumably the people who draft and sign these policies have knowledge of fundamental changes in this area of the law. The parties to the Policies did not change the language of the Policies to conform with the MWCA, and I cannot now conclude that the unambiguous language limiting an "accident" to a 72-hour period means something other than what it clearly says.

Second, the Plaintiff fails to show the conflict between the language of the excess compensation policy and any Maine law. The Plaintiff cites no Maine law that requires excess compensation policies to mirror the coverage provided under the MWCA and no authority for the proposition that the terms and concepts undergirding the MWCA should be read into the Policies to replace the clear terms agreed to by the parties. Importantly, *excess* workers' compensation policies are not *primary* workers' compensation policies. These two types of policies serve different purposes.

Similar arguments to those made by the Plaintiff here were soundly rejected by the Third Circuit in *Neville Chemical Co. v. TIG Insurance Co.*, No. 21-1616, 2022 WL 1222178, at *3 (3d Cir. April 26, 2022). In that case, the district court had ruled that three separate back injuries sustained by an employee in 1993, 2000, and 2003, were not a single "occurrence" and were each subject to separate $500,000 retentions under the self-insured excess workers' compensation policy at issue. *Id.* at *1–2. The Third Circuit upheld the district court's decision, and, in doing so, explained why the plaintiff's attempt to equate the excess insurance policy to a primary insurance policy was misguided:

11

> [Neville] argues that the District Court's reading of the Policy creates an absurdity at odds with the Policy's purpose. The District Court's reading of the Policy, however, far from creating an absurdity, gives effect to the purpose of the Policy as an *excess* workers' compensation policy. Whereas the District Court's interpretation of the Policy is consistent with the general purpose of excess workers' compensation policies, Neville's interpretation would equate this excess policy to a primary workers' compensation policy.

*Id.* at *3. In upholding the district court, the Third Circuit also rejected the argument that the definitions in the state workers' compensation law should be read into the policy.

> References in the Policy to the Pennsylvania Workers' Compensation Act do not somehow incorporate the definition of the term "occupational disease" or the concept of "cumulative injuries" under the Pennsylvania Workers' Compensation Act. To read this term and concept into the Policy to replace the Policy's definition and clear language would materially alter the intent of the contracting parties as embodied by the plain language of the contract.

*Id.*

The Plaintiff seeks to distinguish *Neville* on the ground that, unlike the policies issued by GRC to MMC, "the . . . policy in *Neville* apparently had no provision specifically stating that any policy provision in conflict with the applicable state's law is amended to be in conformity with that state law." Pl.'s Mem. Regarding Suppl. Authority 2 (ECF No. 39). The Plaintiff argues essentially that an excess insurance policy that does not cover gradual injuries would not conform to Maine law and would be void as against public policy. MMC's MSJ 19 ("An interpretation of the policy that renders excess coverage illusory for all gradual injury claims is not a competing reasonable interpretation.").

12

But just because gradual injuries cannot be shoehorned into the "injury by accident" category does not mean that the Policies do not provide coverage for gradual injuries. The Defendant takes the position that gradual injuries fall under the Policies' "bodily injury by disease" language. GRC's Opp'n to MMC's MSJ 7–8 (ECF No. 32). The Plaintiff finds the idea of treating a gradual injury as an "injury by disease" preposterous.  MMC's Reply in Supp. of MMC's MSJ 4 (ECF No. 34) ("Plain and simple, physical injury to a body part from cumulative physical trauma is not considered by anyone to be a 'disease.' "). But is it so preposterous?

I do not see why the term "injury by disease" cannot include gradual injuries. "Disease" is not a defined term under the Policies.[4] "When a word in an insurance policy is undefined, Maine courts look to its ordinary meaning as appearing in dictionaries." *Ruksznis v. Argonaut Ins. Co.*, 774 F.3d 784, 787 (1st Cir. 2014) (citation omitted). Merriam-Webster defines "disease" as "a condition . . . that impairs normal functioning and is typically manifested by distinguishing signs and symptoms." *Disease*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disease (last visited Oct. 21, 2022). A gradual injury can involve a condition of the body that impairs normal functioning and is manifested by distinguishing signs and symptoms. And, to the extent that there is ambiguity, I would interpret the language in favor of coverage. *Foremost Ins. Co. v. Levesque*, 2005

---

[4] The Policies do state that "[d]isease is an accident only if it results directly from bodily injury by accident." Answer to Compl. & Countercl. Ex. A, at 5 (ECF No. 8-1); Answer to Compl. & Countercl. Ex. B, at 5 (ECF No. 8-2).

13

ME 34, ¶ 7, 868 A.2d 244. Because I find that the Policies would cover gradual injuries as injuries by disease, the Policies do not contravene Maine law or any public policy.

## II. How to Treat J.L.'s Injuries Under the Terms of the Policies

Having decided how the Policies should be interpreted, I turn to J.L.'s injuries. Both parties assert that, on this record, I can decide as a matter of law how many injuries J.L. suffered and the number of retentions applicable to those injuries.[5] Despite the parties' attempts to convince me otherwise, however, I view the WCB Order as susceptible to two interpretations.

First, a reasonable factfinder could conclude that J.L. suffered two separate and distinct injuries in 1997 and 2000. The Hearing Officer's decision treated these injury dates as representative of two discrete injuries. It found that the 1997 injuries, which involved the right trapezius, "appear to be new complaints of new injury," unrelated to a previous back injury. May 2006 WCB Order, at 7. And then the WCB specifically quoted one of J.L.'s treating physicians who noted that J.L.'s 2000 injuries, which involved the left trapezius, "appear to be different, at least from the records [from] her right upper trapezius muscle[,] which was a problem previously." May 2006 WCB Order, at 8. The WCB, on reconsideration, made that construction even more apparent by upholding the May 2006 WCB Order "based on work injuries

---

[5] The record here consists of a Joint Statement of Material Facts, the Policies, and the May 2006 WCB Order. The Defendant dropped a footnote informing me that at Phase II, the parties would be conducting discovery about "[t]he precise nature and cause of each injury." General Reinsurance Corporation's Mot. for Partial Summ. J. on Phase I Issues 10 n.2 (ECF No. 29). It strikes me that this information would be helpful to my decision about how to view the injuries under the Policies. The parties apparently wanted to confine my analysis to the facts contained within the WCB Order, since those were the material facts supporting the Board's decision to award benefits.

14

of October 1, 1997 and December 7, 2000." JSMF ¶ 18 (citation omitted). The first interpretation is thus that J.L. suffered two separate injuries arising from separate occurrences (or accidents) under the policy. Under this interpretation, two retentions would apply.

But a reasonable factfinder could also interpret the WCB Order as finding a single gradual injury. The Hearing Officer noted the "fair amount of hand and arm work" required by J.L.'s job. May 2006 WCB Order, at 4. While the Hearing Officer noted that J.L.'s October 1, 1997, injuries, and her December 7, 2000, injuries impacted slightly different parts of her back, the WCB Order also stated that J.L.'s complete disability in 2004 was the "result of the work injuries suffered in 1997 and 2000 injury and their physical and psychological sequelae." May 2006 WCB Order, at 12. The sequelae language suggests that the injuries in 1997 and 2000 may have set the wheels in motion, but the total incapacitation award was based on those incidents plus what occurred over the next four years. Under this reading, the entire arc of injury between 1997 and 2004 could be seen as one gradual injury, which would be considered an injury by disease subject to a single retention.

### III. Putting the Pieces Together

I now turn to the parties' requests for summary judgment, beginning with the Plaintiff. In assessing the Plaintiff's summary judgment motion, I view the facts in the light most favorable to the Defendant. Under that lens, a reasonable factfinder could conclude that two separate injuries (whether by accident or disease) occurred—one in 1997 and the other in 2000. Under this interpretation, viewing the facts in the light most favorable to the Defendant, two retentions would apply. The Plaintiff's

15

motion for summary judgment seeking a finding that a single $500,000 retention applies must therefore be denied.

In assessing the Defendant's summary judgment motion, I view the facts in the light most favorable to the Plaintiff. The Defendant asks me to find that (1) MMC's claim for excess loss indemnification concerns multiple injuries suffered by J.L., (2) a separate $500,000 retention applies to each separate injury within the Policies' lifespans, and (3) even if J.L's injuries are a single cumulative injury, the cumulative injury implicates the Policies only if J.L.'s last day of exposure to the conditions of her employment that caused or aggravated that injury occurred during one of the policy periods. GRC's MSJ 1.

As to the first request, the Defendant is not entitled to summary judgment because, as explained in the previous section, the May 2006 WCB Order is subject to an interpretation that one single cumulative injury by disease occurred. Accordingly, the Defendant is not entitled to summary judgment on the second request because, under the single, gradual-injury interpretation, one retention would apply. As to the third request, however, the Defendant is entitled to summary judgment. If J.L.'s injuries are a single cumulative injury, they are thus an injury by disease that implicates the Policies only if J.L.'s last day of exposure to the conditions of her employment that caused or aggravated that injury occurred during one of the policy periods.[6] As such, the Defendant's Motion for Summary Judgment is granted in part.

---

[6] The 2001–2003 Policy was in effect through January 1, 2003, and J.L.'s last day of employment was March 8, 2004. JSMF ¶ 12. The facts are silent as to J.L.'s last day of last exposure to the conditions of her employment that caused or aggravated her injury.

16

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Plaintiff's motion for summary judgment (ECF No. 30) and **GRANTS IN PART** and **DENIES IN PART** the Defendant's motion for summary judgment (ECF No. 29).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 21st day of October, 2022.